

November 25, 2019

To the Honorable John C. Coughenour,

I am writing this report at the request of Assistant Federal Defender Mohammad Hamoudi regarding his client, Joseph Loren Allen, DOB ▉▉▉▉▉. Mr. Hamoudi and Assistant Federal Defender Christopher Sanders requested that I consult on Mr. Allen's case over ongoing concerns that he is not receiving adequate healthcare following an injury he sustained on the night he was apprehended.

I am an internal medicine physician at Harborview Medical Center, where Mr. Allen received some of his care during his incarceration. My duties include providing medical care for indigent populations and providing perioperative medical consultation to my colleagues who specialize in trauma surgery, including orthopedic trauma. At the request of Mr. Hamoudi, I reviewed Mr. Allen's medical records and relevant court proceedings from August 23, 2018 to the present and interviewed Mr. Allen on October 10, 2019 in person to confirm the key elements of the record and elicit Mr. Allen's perspective on the matter.

The following is a summary of Mr. Allen's medical situation based on medical and judicial records. Later in this report I summarize my interview with Mr. Allen and provide my medical opinion.

_____

This 36 year-old male sustained bilateral ankle fractures on August 23, 2018 during an encounter with the Auburn police in which he was struck by a police car. He was taken to St. Francis in Tacoma where he underwent surgical repair (open reduction and internal fixation) of both ankles without any immediate postoperative complications. He also had a shoulder dislocation that was treated successfully. He was discharged to King County Correctional Facility on August 26, 2018 in ankle casts with instructions not to bear weight until outpatient follow-up.

For reasons that are unclear from the records I reviewed, follow-up was never scheduled. On October 6, 2018, Mr. Allen requested evaluation by KCCF staff due to ongoing pain particularly in his right ankle, which was still in a cast. (He had already removed the cast on the left ankle by himself.) He was escorted to the Harborview Medical Center Emergency Department, where he was evaluated by on-call orthopedic surgery resident Dr. Taylor. Dr. Taylor examined the Mr. Allen and obtained x-rays, noting no concern for postoperative complications (e.g., joint misalignment) as a cause for his pain. Dr. Taylor performed wound care, placed Mr. Allen in a splint, and recommended that he continue not to bear weight until a subsequent follow-up in the orthopedic clinic.

In an arraignment hearing on December 6, 2018, the government acknowledged Mr. Allen's injuries and stated that a "concrete treatment plan" was needed, including a plan for physical therapy and rehabilitation. On December 13, 2018, Mr. Allen was seen at the Harborview orthopedic clinic by resident Dr. Tolley and attending surgeon Dr. Dunbar. Repeat x-rays confirmed that all fractured bones remained in anatomic alignment and that the fixation screws were in the correct positions.

The physicians at Harborview documented that Mr. Allen was experiencing significant pain with walking, which they felt was due to having spent three and a half months in a wheelchair and with resulting swelling, weakness, and loss of ability to move the joint fully. They encouraged him to participate in a physical therapy program to regain function of the ankle. Importantly, they noted that the x-rays suggested that healing of the right ankle bones was not complete; they recommended that, that in addition to participating in physical therapy, Mr. Allen follow up within 2 months to ensure the bones continued to heal.

*(Author note: it is unclear from my review of the records as to why there was no follow-up on Harborview's physical therapy recommendation. In a community setting, the role of a physician or surgeon is to recognize the need for physical therapy and order a referral as part of their plan. It is the role of the physical therapist to evaluate the patient who has been referred and to prescribe a concrete and detailed treatment plan. Most physicians and surgeons do not have the expertise themselves to provide detailed "prescriptions" for physical therapy. It would ordinarily be the role of Mr. Allen's caretakers to follow up on the physician/surgeon's recommendations and organize an escorted visit to a community-based physical therapist to obtain an evaluation and prescribe a treatment regimen.)*

On January 7, 2019, the Bureau of Prisons medical staff sent a request for a follow-up clinical visit, i.e., with an ankle specialist. For reasons that are unclear from the records, Mr. Allen was sent to Virginia Mason Medical Center instead of Harborview or St. Francis. At Virginia Mason, he was evaluated on February 14, 2019 by podiatrist Dr. Reeves (who is not a specialist in ankle surgery). Dr. Reeves documented that the client had ongoing pain, particularly in the right ankle, and obtained an x-ray that he read as concerning for incomplete healing of the bones on the right ankle. Dr. Reeves' documented plan was to review the case with one of his colleagues who specialized in ankle surgery.

The FDC medical staff did provide some care for Mr. Allen during this time period. Notably, he was evaluated by ARNP Giles on March 18, 2019, who was aware of the prior surgical history and noted "mild limitation" in range of motion of the ankle; however, this provider "advised it is normal to have symptoms of osteoarthritis and to continue with exercise but avoid high impact activity." (According to the records I reviewed, Mr. Allen had not been given a diagnosis of osteoarthritis by the ankle specialists and Harborview or Virginia Mason either before or after this encounter.) Dr. Reeves's note from February 14, 2019 states that he would "consult" with one of his surgical colleagues, but there does not appear to have been any follow-up to this consultation.

On April 11, 2019, Mr. Hamoudi and Mr. Sanders filed a motion that expressed concerns about Mr. Allen's medical care in the preceding months and advocated for him to be released to the community.

The defense's case was heard on April 25, 2019. There were two notable pieces of evidence submitted for this hearing. First, Dr. Reeves wrote to the Bureau of Prisons explicitly recommending that Mr. Allen be referred to Dr. Heit, a podiatrist with expertise in ankle surgery at Virginia Mason. Second,

FDC provider Dr. Dy submitted a statement arguing that Mr. Allen was receiving adequate medical care at FDC. It is unclear from the records whether Dr. Dy had met or examined Mr. Allen in person.

At the April 25, 2019 hearing, Mr. Sanders laid out a case for release of Mr. Allen based on what he deemed were inappropriate or unreasonable delays in Mr. Allen's care and follow-up plan. He also argued that the decision about release should be reassessed by the court (which had previously denied this request) because Mr. Allen's clinical situation has changed – i.e., that there was now greater evidence that surgery would be needed.

Dr. Dy's declaration submitted on April 24, 2019, which I have reviewed, argued that Mr. Allen's care at FDC was adequate because (i) her review of FDC medical records that indicated Mr. Allen's pain was under control and his gait not significantly impaired (see below), and (ii) the recommended evaluation by Dr. Heit was already scheduled for May 30, 2019.

According to the records I reviewed, Dr. Dy's statement, and the prosecution's position, appears to have relied primarily on the March 18, 2019 evaluation by FDC ARNP Giles – the same evaluation in which Mr. Allen was told he had symptoms of "osteoarthritis" – as evidence the client's health issues were stable. However, I note that ARNP Giles's record of the encounter documented "intermittent achiness and sore joint anf (sic) feeling stiff early morning hours," which in my view is not the same as having minimal or well-controlled pain. The record also documented that "[Mr. Allen had] been exercising daily and [did] not have major mobility issues."

*(Author note: I would stress that, from a clinical standpoint, the terminology used here is nonspecific: depending on context, it could accurately describe someone in near-perfect health, or it could accurately describe someone who can walk slowly and carefully [a form of "exercise"] but not much more – if by "major mobility issues" the clinician means that the patient would be invalid or confined a wheelchair.)*

Mr. Allen was next assessed by Dr. Heit on May 31, 2019. Dr. Heit's records document ongoing, severe pain with walking on the right ankle. After review of the prior x-rays and examination of the right leg, Dr. Heit concluded that there was good evidence the bones were continuing to heal and that the pain was most likely due to "capsulitis" of the right ankle joint.

To address Mr. Allen's pain and functional limitation due to capsulitis, Dr. Heit recommended a multi-step treatment program that would involve, at a minimum, a physical therapy regimen and potentially steroid injections; however, his main suspicion was that the fixation screws (particularly on the right ankle) were too tight, preventing Mr. Allen from walking normally and making inflammation of the joint lining (capsule) worse. Further, Dr. Heit noted that in most cases of ankle fracture these fixation screws would have been removed within 2-3 months after surgery – i.e., by October or November 2018 in Mr. Allen's case.

Dr. Heit recommended a CT scan of the ankle to ensure complete healing of the bones. Assuming the bones were completely healed, Dr. Heit said that he would then "sooner rather than later" remove the hardware, place the client in a boot for 1-2 weeks, then prescribe a physical therapy program. The recommended CT scan was done on July 15, 2019. The scan was read by a radiologist, but in the records I reviewed, there is no record of communication of these results to Dr. Heit, nor communication between the FDC staff and Dr. Heit.

Since his May 31 visit to Dr. Heit, Mr. Allen has not seen any medical practitioner outside the FDC.

*(As an aside, I also noted documentation in his medical records of "refusal" of medical treatment. Specifically, Mr. Allen refused a blood draw on December 18, 2018 (for CMP, lipid panel, hepatic panel, TSH, T4, HIV, hepatitis panel, CBC w/ diff, HA1c, and microalbumin) and on June 4, 2019 (for microalbumin, CMP, hepatic [panel], lipid [panel], CBC, and A1c). No further indication was given for these tests except to "assist with diagnosis and treatment." I cannot find in the medical record any symptoms or signs that would definitively warrant these lab tests. Of these tests, HIV, hepatitis panel, lipid panel, TSH and A1c are often recommended for asymptomatic adults as part of routine primary care health screening, but there is no urgency to such screening tests, and in everyday clinical practice patient refusal is not uncommon.)*

_____

When I spoke to Mr. Allen face-to-face on October 10, 2019, he confirmed the above information in his own words. His recollection of the events, including assessment and medical recommendations, matched the physicians' documentation very closely.

Mr. Allen currently reports ongoing severe pain in his right ankle, rated 8 out of 10. Any level of physical activity that is more than mild makes the pain worse, including climbing in and out of his bunk at night, going up steps at a rapid pace, running, and jumping (e.g., basketball, jump rope). The pain disrupts his sleep at night. It takes him 30-45 minutes in the morning to get his ankle to a point where he can walk on it. He is trying to rehabilitate himself by following the tips he was given by the orthopedic surgeons at Harborview – e.g., lunges and calf raises.

He states that the medical staff at the FDC evaluated him at his request regarding his ankle pain several times since the beginning of this year. In his view, their recommendations have not generally been helpful. He has only been given oral pain medications (diclofenac and acetaminophen). He again expressed concern to me that the staff have delayed necessary medical care. For example, he states that on one occasion he saw in his chart that there were paper copies of his medical records, including external physician recommendations for follow-up, physical therapy, and potential need for surgery, but that these issues were not addressed by the FDC staff. He requested repeatedly to see a physical therapist but was told "we don't do that here."

It was outside the scope of my consultation to perform a comprehensive medical evaluation, but I noted that when I observed him walking around the meeting hall, he had a limp that became more pronounced with rapid walking. He grimaced when showing me how the range of motion in his right ankle is limited. The limitation was most pronounced when he attempted to turn his right foot inward (inversion) and when he flexed the sole of his right foot (dorsiflexion).

In a follow-up correspondence between myself and the Mr. Hamoudi's staff on November 6, 2019, it was relayed to me that Mr. Allen continued to report "8 out of 10" pain in the right ankle. Mr. Allen also reported that he was told by a "PA" at the FDC that "he needs the hardware and probably should not have it removed," which conflicts with the recommendation of the ankle specialist, Dr. Heit.

_____

Although I am a general internist and not an orthopedic surgeon, the evidence I have gathered is generally consistent with the assessment of Dr. Heit at Virginia Mason. Essentially, Mr. Allen is dealing with severe, chronic, post-operative pain that is the direct consequence of not having received post-operative medical care consistent with professional quality standards. To be clear, I am not implying any negligence on the part of his physicians at St. Francis, Harborview, or Virginia Mason; rather, these providers all seem to have delivered good-quality care under the circumstances.

In a community setting, a young, healthy male with an isolated orthopedic injury would usually have had a relatively smooth post-operative course. Such an individual would have been seen frequently after surgery and by his primary surgeons (in this case, St. Francis) – e.g., on multiple occasions in the first few months after surgery, and within days to weeks if there were concerns such as persistent severe pain or functional limitation. As Dr. Heit's note indicated, there might have been a removal of hardware (another surgery) by early 2019 once the bones had completely healed. In parallel, the patient would have been going regularly (e.g., weekly) to an outpatient rehabilitation program and, under the supervision of a physical therapist, would be doing a series of (daily) exercises to regain function. Such a patient would be expected to be back on his or her feet within a few months of the initial injury.

In my view, the root cause of Mr. Allen's symptoms and limited function of his right ankle is two-fold. First, there were a number of delays in early/mid 2019 in obtaining an assessment by an ankle specialist. That there was a five and a half month gap in review of his case – i.e., December 13, 2018 (when he was seen by Drs. Tolley and Dunbar at Harborview) to May 31, 2019 (when he was seen by Dr. Heit at Virginia Mason) – is highly unusual in light of Mr. Allen's ongoing symptoms and documented abnormal findings on physical examination. Second, the lack of any engagement in a physical therapy program in the 15 months since the initial injury is truly striking.

In my opinion, it is likely that initiation of a standard-of-medical-care physical therapy regimen in the days following his injury could have made a substantial difference in his clinical trajectory. Timelier follow-up by an ankle specialist might have led to an earlier diagnosis of capsulitis and initiation of specific treatment (e.g., surgery or steroid injections) that could have significantly improved Mr. Allen's pain and functional limitation. I note that the medical assessments of the FDC staff were consistently more sanguine than the assessments of the specialists at Harborview and Virginia Mason; the former might have influenced the FDC's perception of urgency of need for specialist follow-up and for physical therapy.

Presuming that the diagnosis by Dr. Heit (capsulitis) is correct – and I have no reason to suspect it is not – it does appear that there are some treatment options for Mr. Allen going forward, as outlined in Dr. Heit's May 31, 2019 note. I should stress that I am not qualified medically to predict how much functional improvement he would get from surgery (removal of fixation screws) as compared to a more conservative approach (physical therapy and steroid injections), since his case is so atypical in terms of the timing of this operation vis-à-vis his original surgery and the severity of his pain.

I do feel confident that, if no attempt is made to remedy his current situation, he will probably continue to lose function in his right foot over time and could potentially develop chronic degenerative arthritis. Further, the sustained use of diclofenac or other prescription-strength NSAIDs at these doses poses threats to his kidneys, liver, gastrointestinal system, and heart over the long term.

In light of all these factors, I strongly recommend that Mr. Allen be scheduled to see a foot/ankle specialist – such as Dr. Heit at Virginia Mason or Dr. Dunbar at Harborview – as soon as possible. This specialist evaluation would include another physical exam and possibly repeat imaging (depending on the formal report from of the July 15, 2019 CT scan, which I do not have access to) with a view to counseling Mr. Allen on the potential risks and benefits of surgery vs. conservative treatment options. A repeat assessment will be necessary because much could have changed, clinically speaking, in the nearly six months since he was seen by Dr. Heit. In my opinion, it will also be important for the specialist also to comment on the risks and benefits of the "status quo" – i.e., no access even to conservative treatment options or physical therapy.

I also strongly recommend that, with documentation of this specialist assessment in hand, Mr. Allen be assessed by a physical therapist, with a view to specifying the sort of rehabilitation regimen that would be required based on the client's current functional limitation and plan for surgery, if any. I might also recommend that the physical therapist assessment include documentation of any restrictions in walking, running, and jumping.

While I would defer to the foot/ankle specialists on the potential benefits of surgery, I suspect that surgery, if indicated, would result in significant improvement in function and reduction in pain. It could also keep Mr. Allen from having to rely on medications like diclofenac and acetaminophen, with all their long-term side effects, for pain control.

It is important to note also that, should Mr. Allen be deemed a good candidate for surgery, the surgical plan would probably include a post-operative rehabilitation program of considerable intensity (e.g., a daily exercise program under the supervision of a physical therapist). Not being able to participate in physical therapy would greatly reduce the benefit of surgery. It does not appear that Mr. Allen would be able to participate in a physical therapy program while in custody at the FDC.

I appreciate the opportunity to provide my expert opinion on this medically very unfortunate situation and am happy to continue consulting on Mr. Allen's case once he has been evaluated by a foot/ankle specialist and by a physical therapist. I would be very concerned if the discordance between the assessments of the FDC and specialist providers (like Harborview and Virginia Mason) persists.

Regards,

David A. Watkins, MD, MPH
Assistant Professor, Division of General Internal Medicine
Attending Physician, Harborview Medical Center
University of Washington
davidaw@uw.edu