
THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>JOSEPH LOREN ALLEN,<br>Defendant. | No. CR18-292JCC |

---

ARRAIGNMENT

The Honorable Paula L. McCandlis Presiding

December 6, 2018

---

TRANSCRIBED BY: Jennifer A.P. Albino, CET
Reed Jackson Watkins, LLC
Court-Certified Transcription
206.624.3005

A P P E A R A N C E S

PRESIDING JUDGE:

PAULA L. MCCANDLIS

FOR THE UNITED STATES:

JESSICA M. MANCA

United States Attorney's Office

700 Stewart Street

Suite 5220

Seattle, Washington 98101-4438

FOR THE DEFENDANT:

MOHAMMAD ALI HAMOUDI

Federal Public Defender Office

1601 Fifth Avenue

Suite 700

Seattle, Washington 98101-1642

I N D E X O F P R O C E E D I N G S

Arraignment.............................................. 4

Argument by Mr. Hamoudi Regarding the Medical Issue........ 8

Argument by Ms. Manca Regarding the Medical Issue.......... 9

Further Argument by Mr. Hamoudi Regarding the Medical Issue 11

Ruling by the Court Regarding the Medical Issue............ 13

ARRAIGNMENT 4

-o0o-

December 6, 2018

THE CLERK: All rise. United States District Court for the Western District of Washington is again in session. The Honorable Paula L. McCandlis presiding.

THE COURT: Good morning. Please be seated.

MR. HAMOUDI: Good morning, Your Honor.

THE CLERK: Your Honor, the matter before the Court this morning is an arraignment in Case CR18-292 assigned to Judge Coughenour, United States of America versus Joseph Loren Allen.

Please make your -- Counsel, please make your appearances.

MS. MANCA: Good morning, Your Honor. Jessica Manca for the United States.

THE COURT: Good morning, Ms. Manca.

MR. HAMOUDI: And good morning, Your Honor. Mohammad Hamoudi from the Federal Defender's Office. I'm here an behalf of Mr. Allen.

THE COURT: Good morning, Mr. Hamoudi.

And good morning, Mr. Allen. Mr. Allen, I want to let you know that you're here for your arraignment. And during an arraignment, you'll be advised to the charges that have been returned against by the grand jury and the penalties associated with those charges. Your attorney will then be

asked to enter a plea on your behalf. And that is the procedure today, okay? And we --

THE DEFENDANT: Okay.

THE COURT: -- set a trial date as well.

THE DEFENDANT: Okay.

THE COURT: Mr. Hamoudi, will you waive a formal reading of the indictment?

MR. HAMOUDI: We do, Your Honor.

THE COURT: All right.

Ms. Manca, will you please advise Mr. Allen of the charges returned against him by the grand jury and the penalties associated with those charges.

MS. MANCA: Yes, Your Honor. Mr. Allen is charged in a four-count indictment.

Count 1 alleges a charge of Felon in Possession of a Firearm, allegedly occurring on or about May 28th, 2018, in the city of Auburn within this district. Mr. Allen, having been convicted of felony crimes of Attempt to Elude, Taking a Motor Vehicle without Permission, Taking a Motor Vehicle without Permission and Attempt to Elude, Possession of Methamphetamine, Taking a Motor Vehicle without Permission, Unlawful Possession of a Firearm in the First Degree, and Unlawful Possession of a Firearm in the Second Degree, did knowingly possess a Sig Sauer .40 caliber handgun, a firearm that had been shipped and transported in interstate and

foreign commerce in violation of Title 18, United States Code, Section 922(g)(1).

Count 2 also alleges a charge of Felon in Possession of a Firearm on a different date, August 23rd, 2018, in the city of Federal Way within this district. Mr. Allen, having been convicted of the felony crimes described in Count 1, did knowingly possess, in and affecting interstate and foreign commerce, a Taurus 9mm caliber handgun in violation of Title 18, United States Code, Section 922(g)(1).

Each of these crimes, Counts 1 and 2, carries a maximum term of imprisonment of up to ten years, a fine of up to $250,000, a period of supervised release of up to three years, and a $100 special assessment.

Count 3 alleges Possession of Methamphetamine with Intent to Distribute. On or about August 23rd, 2018, in the city of Federal Way within this district, Mr. Allen did knowingly and intentionally possess with intent to distribute methamphetamine in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C). This crime carries the maximum term of up to 20 years imprisonment, a maximum fine of one million dollars, at least three years of supervised release, and a $100 special assessment.

Count 4 alleges Possession of a Firearm in Furtherance of a Drug Trafficking Crime. On or about August 23rd, 2018, in the city of Federal Way within this district, Mr. Allen

possessed a firearm, a Taurus 9mm caliber handgun, in furtherance of possession of methamphetamine with intent to distribute, as charged in Count 3 above, in violation of Title 18, United States Code, Section 924(c).

There's also an asset forfeiture allegation as to the firearms.

THE COURT: Thank you Ms. Manca.

Mr. Hamoudi, what plea what would you like to enter on your client's behalf?

MR. HAMOUDI: Not guilty to all charges.

THE COURT: Pleas of not guilty will be entered as to all charges.

Do you have a trial date?

THE CLERK: Yes, Your Honor. Judge Coughenour has scheduled trial for January 22nd, 2019, at 9:30 a.m. Proposed trial exhibits are due that same day. Pretrial motions are due December 27th.

THE COURT: Mr. Hamoudi, do you wish pretrial discovery?

MR. HAMOUDI: Yes, we do, Your Honor, under the local rules and criminal rules of procedure.

THE COURT: I would direct counsel to meet and confer and carry out the respective obligations regarding discovery in criminal cases.

Is there anything further from the Government?

MS. MANCA: No, Your Honor.

THE COURT: Anything further, Mr. Hamoudi?

MR. HAMOUDI: Yes, Your Honor. At Mr. Allen's initial appearance, I had raised the prospect of an issue with Judge Donohue. The issue is, is that Mr. Allen has some medical issues that relate to this case. And he is not, at this point, receiving the care that he needs. And I want to be specific. He was supposed to receive a follow-up visit with a surgeon -- an orthopedic surgeon because his -- both of his legs were shattered after he was run over by a police vehicle. And in addition, he needs physical therapy.

Regardless of what he's charged with, true or not, my concern right now is, is he does not suffer permanent injuries. Without physical therapy, the existing conditions will exasperate. We have placed the Bureau Of Prisons Federal Detention Center on notice that he needs to get the care that he needs. I've let the U.S. attorneys know that he needs to get care. As far as I'm concerned, they both represent the Department of Justice, and I'm asking them to come up with a solution to get him the care that he needs. And if they do not or are not able to, I think that I would want to return to court and have a fashion of bond to release him somewhere where he can start to receive care.

I don't think he's a flight risk or a danger to the community, given his medical state. But the last thing I want to happen is, regardless of what's happened in the

case, is that he -- ten years down the line he's not able to walk or things like that. I think that's important.

THE COURT: Thank you, Mr. Hamoudi.

Ms. Manca, did you have a response to the --

MS. MANCA: Yes, Your Honor, two things. I think the Government has been in touch with the Bureau of Prisons regarding this before Mr. Allen was transferred here, so they're aware of the medical condition. And I think Mr. Hamoudi has also been in touch with counsel for the Bureau of Prisons.

What would be helpful for the Government at this point is for the defense to provide a list of the care that they believe that Mr. Allen needs and sourcing for that, the explanation -- the medical explanation for what care is needed. And then we can provide that to the Bureau of Prisons and receive a response from them regarding what they feel that they can provide in response to that. And that will allow us to have a productive conversation.

THE COURT: So I understood that they had asked for some physical therapy.

MS. MANCA: Uh-huh.

THE COURT: And so what would be -- when you say "the sourcing," what are you talking about exactly?

MS. MANCA: Well, I assume that physical therapy, just given our understanding of general medicine --

THE COURT: Yeah.

MS. MANCA: -- is required. But a more specific explanation of -- perhaps a doctor's note, regarding a follow-up, of this is the referral that we have for this -- for this reason and this is what we expect, and then what the Bureau of Prisons can provide. For example, we don't know how many times a week, we don't know how often or what the duration might be, what the scope of that physical therapy might entail, and whether, you know, it's common for people to be released from the Bureau of Prisons for small sets of time to perform various medical procedures. And I don't know whether the scope of that physical therapy is going to be within what the Bureau of Prisons can do. But until we have a concrete treatment plan or explanation of treatment needs, I think it's difficult for the Bureau of Prisons to say, "Yes, we can do this" or "No, we can't."

THE COURT: And what about the issue that was raised to have a hearing so that -- so that there could be a discussion about whether a bond is appropriate?

MS. MANCA: I think we, um -- well, Mr. Allen stipulated to detention without prejudice, so I think he's entitled to a hearing upon a showing of change in circumstances or anything else that would comply with the local rule in that respect. I think in order for there to be a change of circumstances that would meet that requirement, there would

need to be a showing by the defense that the Bureau of Prisons is unable to meet the requirements that Mr. Allen needs for medical care. Not only that, but also that whatever plan is in place would ensure the safety of the community and ensure Mr. Allen's likelihood to appear for court. So there are a number of steps, I think, that need to be -- happen preliminarily before either party, and particularly the defense, would be in a position to make that threshold showing.

THE COURT: All right. Thank you, Ms. Manca. And thank you for your explanations as well.

Mr. Hamoudi, I think that you -- it sounds as though you have been making these -- the same point for Mr. -- for Judge Donohue as well as for this Court. And it seems to me that, with some paperwork, perhaps you could bring that motion to the Court's attention.

MR. HAMOUDI: Your Honor, if I may, I have paperwork right here. I have medical records from St. Francis and Harborview Medical Center that's saying he needs to have a follow-up with an orthopedic surgeon. He was in a wheelchair. He had casts. There are no orthopedic surgeons at the Federal Detention Center. So as far as specifically what's needed now, the first thing that needs to be done is an arrangement needs to be made for him to be taken to an orthopedic surgeon who can see how he has been recovering

since two major surgeries he's had. Then the orthopedic surgeon will then say, "This is what's needed for you" -- like any normal citizen -- "to recover from these injuries," and can lay out a recovery plan, and we can get the insight that the Government requests.

THE COURT: Okay. So the first question I have, based on what the Government has told me, is have the -- you have provided that information to the Bureau of Prisons.

MR. HAMOUDI: Yes.

THE COURT: Okay. And then what is the process as far as with Pretrial Services as working with them to maybe create a plan?

MR. HAMOUDI: My general experience is this, is that it really has to do with the staffing and resources of the Federal Detention Center because they have to commit corrections officers and have transportation come by, pick him up, and then deliver him to the facility for him to get the care and need he -- he's supposed to get. The alternative approach is, is that if the Court wants him to take on that responsibility, then what would happen is that we would fashion a bond, and he's no longer the responsibility of the Federal Detention Center.

So all I am saying is this -- that I know he's got to go see the surgeon. So at this point he's the Department of Justice's responsibility, and they can go ahead and then

make the arrangements. If they're saying to us, "We don't have the resources" or "We are not willing to," then they need to just tell the Court that either today or in writing in the next few days, and then what we can do is then come up with fashioning a bond so that I can make my own arrangements to make sure he gets treatment. That's my position.

THE COURT: All right. What I would like to see happen is have this motion that you're making and the evidence that you have for your client be fashioned into a written motion for this Court.

MR. HAMOUDI: Okay.

THE COURT: And then we can schedule that. I will be certainly here today and tomorrow. I don't know what the government schedule is.

But, Mr. Clerk, do we have a time?

THE CLERK: Your Honor, tomorrow is pretty wide open as far as hearing times available. There's also later this afternoon, possibly at 3:00, if it came to that. But tomorrow, if the parties would just contact me, we can set a time.

MS. MANCA: And, Your Honor, the Government's position is that -- you know, I don't know how long the Bureau of Prisons has had this information, so, certainly, they need time to consider this information, go back and decide how

much time it would take to comply with it. So today or tomorrow isn't necessarily, I think, feasible, again, not having talked to them. This is all coming to my attention now --

THE COURT: Right.

MS. MANCA: -- for the very first time. Not the general medical condition that Mr. Allen has, but his need for a specific follow-up step. So I think, again, with a written motion, we can -- we can set a hearing probably for tomorrow. I think next week would probably be better. And then I can have the Bureau of Prisons on board. But, again I'll defer to the Court.

THE COURT: I want to set the motion for tomorrow --

MR. HAMOUDI: I --

THE COURT: -- if that's possible. Or no.

MR. HAMOUDI: -- I would love -- time, it would -- I would love to the this quickly. But I --

THE COURT: Yeah.

MR. HAMOUDI: -- think that -- Your Honor, if I may suggest, I think the better approach is, is that -- Ms. Manca or somebody in her office -- to get the Federal Detention Center on the phone and get me on the phone and get an understanding of what the realities -- whether this is going to happen and when. And I think that if we understand that that's not going to happen, then I think we

can set it for sometime next week. But I agree with Ms. Manca that we should explore that. But at this time I don't see it happening. But maybe persuasion from the United States Attorney's Office will result in something else. That's -- I think later would be better, actually.

THE COURT: Okay.

Is that --

MS. MANCA: Yeah. That --

THE COURT: -- is that acceptable to you?

MS. MANCA: -- that work fors me, uh-huh.

THE COURT: All right. So if you do need a hearing date, you know where to call -- who to call.

MR. HAMOUDI: Thank you very much, Your Honor.

THE COURT: Yeah. All right.

Anything further from the Government?

MS. MANCA: Not from the Government, thank you.

THE COURT: Anything further, Mr. Hamoudi?

MR. HAMOUDI: Nothing else. Thank you, Your Honor.

THE COURT: All right. Mr. Allen, good luck. I am very sorry --

THE DEFENDANT: Thank you.

THE COURT: -- to hear your circumstances.

THE DEFENDANT: Thank you.

THE CLERK: All rise. Court is in recess.

(Proceedings concluded)

/s/Jennifer A.P. Albino, CET/ October 15, 2019

AAERT Certified Electronic Transcriber
Reed Jackson Watkins
Court Approved Transcription Company
1326 Fifth Avenue, Suite 710
Seattle, Washington 98101
206.624.3005

Jennifer Albino